UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHNNY NIEVES,  )
)
    Plaintiff,  )
)  Case No. 12-cv-9854
    v.  )
)  Judge John W. Darrah
CAROLYN W. COLVIN, Acting  )
Commissioner of Social Security.  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Johnny Nieves seeks to reverse and remand the Social Security Administration

Commissioner's decision denying his claim for disability benefits. For the reasons explained

below, Nieves's Motion is denied, and the Commissioner's final decision is affirmed.

## BACKGROUND

On October 21, 2010, Nieves applied for Supplemental Security Income payments

("SSI"), alleging a disability onset date of May 1, 1998. (Administrative Record ("AR") 118,

287.) His application was denied by the Commissioner initially and on reconsideration. (AR

120-30.) Nieves then requested a hearing before an Administrative Law Judge ("ALJ"), which

was held on April 13, 2012, after three previous postponements requested by Nieves related to

issues of representation. (AR 35-117.) On July 18, 2012, the ALJ issued a decision finding

Nieves not disabled. (AR 8-34.) The Appeals Council denied further review of Nieves's claim

on October 16, 2012. (AR 1-4.) Thus, the ALJ's decision is the final decision of the

Commissioner and is ripe for review. *See* 20 C.F.R. § 404.981; *Eads v. Secretary of Health and*

*Human Services*, 983 F.2d 815, 816 (7th Cir. 1993).

Nieves was born on September 5, 1966.  (AR 44.)  He currently lives with and is in the care of a friend.  (*Id.*)  In terms of education, Nieves has graduated from high school.  (*Id.*)  He last worked as a laborer in 2005.  (AR 18.)  He has two children.  (AR 587.)

On December 20, 2005, Nieves was evaluated by Dr. Peter Biale relating to a past disability claim for a fractured left leg, and Dr. Biale documented a limp related to the injury but otherwise noted that Nieves was alert, oriented, and able to concentrate and maintain attention span.  (AR 365-66.)  Nieves was seen by Dr. Carlos Pedrera on May 24, 2007, with a complaint of feeling tired and weak with a lack of energy and feeling sad; Dr. Pedrera noted fatigue, substance abuse, depression, and umbilical hernia.  (AR 375.)  Nieves was admitted for 72 hours of detox related to heroin use on May 25, 2007.  (AR 374.)  He was then diagnosed with Hepatitis C on June 29, 2007.  (AR 373.)  Nieves was seen at the University of Illinois Medical Center at Chicago ("UIC"), and his depression was noted along with an improved mood as a result of medication.  (AR 406.)  He continued treatment at UIC for Hepatitis C through June of 2008 and was compliant with the addictions program.  (AR 404.)

Nieves was admitted to St. Mary and Elizabeth Medical Center for five days on January 30, 2008 for depression.  (AR 382, 411.)  He returned on February 18, 2008, for follow-up based on his Chronic Hepatitis C virus ("HCV") infection and was documented as taking the following medications:  Suboxone, Trazodone, Risperdal, Buspirone, Lexapro, and Afrin nasal spray.  (AR 411.)  There was concern expressed that starting interferon treatment for Hepatitis C could worsen his anxiety, so he was advised to continue treatment with Dr. Chung K. Chen for anxiety and depression and follow up in three months.  (AR 412).  Dr. Chen provided physician's progress notes related to Nieves, dated from May 2007 through June 2009.  (AR

724-33.)[1]  Nieves was also seen at St. Mary and Elizabeth Medical Center on July 6, 2009, for

medication refills (while in custody of the Chicago Police Department), and the admission sheet

listed his employment as short-order cook at Best Submarine.  (AR 444.)  The accompanying

assessment documented no other medical complaints, a normal gait, good eye contact, coherent

speech, and normal affect.  (AR 445-48.)

Nieves was incarcerated in late 2009 for charges of burglary (AR 587), and the

Department of Corrections medical chart listed the following medications:  Risperdal, Sertraline,

Trazodone, and ibuprofen.  (AR 469.)  He was also found physically fit to perform any type of

work or recreation while incarcerated.  (AR 575.)  On December 21, 2009, Nieves received an

initial psychiatric evaluation in prison, during which he reported mood symptoms, hearing voices

for a number of years, crying spells, anxiety, irritability, and feelings of hopelessness when he

developed depression.  (AR 538.)  Nieves disclosed two prior suicide attempts to the prison

psychiatrist but denied any issues with appetite, energy, anhedonia, memory, concentration, or

thoughts of hurting himself or others.  (AR 587.)  Based on this examination, Nieves was

diagnosed with mood disorder not otherwise specified with psychotic features and a history of

polysubstance abuse apparently in remission, and his medications were increased.  (AR 588.)

On the same day, there was also an x-ray taken of his left ankle, which showed a healed, fixated

fracture of the distal fibula without displacement, and an old healed fracture of the distal tibia,

with cortical thickening and central lucency in medial distal tibia, probably from old trauma.

(AR 498.)

---

[1] However, at the hearing, Nieves claimed he had been seeing Dr. Chen from 2004
through 2009.  (AR 51.)

From January through April of 2010, Nieves was treated in prison for complaints of weight gain, constipation, cold intolerance, fatigue, lethargy, lack of motivation, aches and pains, and feeling depressed with mood swings and difficulty with concentration and memory loss. (AR 461.)  He was also diagnosed with hypothyroidism, and he claimed to hear voices, although he later said that was not the case and that he only said that to get an appointment sooner.  (AR 477.)  The examiner noted that he was alert, cooperative, and fully oriented with ordered thoughts, and that Nieves reported that his medications were working well and that he was feeling better.  (*Id.*)  On March 31, 2010, Nieves stated that he felt fine, did calisthenics in prison, and worked out three times a week.  (AR 460.)   He was seen for follow-up psychiatric evaluations and medication management in July, September, and November of 2010 and reported improving symptoms and feeling happier.  (AR 472-73, 578.)

On December 30, 2011, Nieves was evaluated by a state agency medical consultant, Mina Khorshidi, M.D., to prepare a physical residual functional capacity, taking into account his ankle injury, Hepatitis C, and hypothyroidism.  (AR 542.)  Dr. Khorshidi opined that Nieves could perform light work, carrying 20 pounds occasionally and 10 pounds frequently, could stand or walk for 6 hours in an 8-hour workday, could sit for 6 hours in an 8-hour workday, was unlimited in his ability to push and/or pull, had no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations.  (AR 542-49.)  On the same day, Nieves was evaluated for mental residual functional capacity and psychiatric review technique by Kyla King, Psy.D., taking into consideration Nieves's affective disorder under Section 12.04, personality disorder under 12.08, and substance addiction disorders under Section 12.09.  (AR 550-67.)  Dr. King opined that Nieves is moderately limited in the ability to carry out detailed instructions, maintain attention and

concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, in the ability to accept instructions and respond appropriately to criticism from supervisors, in the ability to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others. (*Id.*) Based on this, Dr. King opined that Nieves had the ability to perform at least unskilled work. (AR 553.)

Nieves was examined on January 24, 2011, prior to his release from prison; the examiner noted that the medications were working well, provided a refill, and also noted that Nieves displayed good eye contact, normal speech, and good impulse control. (AR 577.) Nieves received another physical residual functional capacity assessment on March 4, 2011, with results corresponding to the previous assessment done on December 30, 2011. (AR 603-10.) He also received another mental residual functional assessment on the same day by Roger Rattan, Ph.D. Dr. Rattan opined that Nieves was: moderately limited in the ability to maintain attention and concentration for an extended period; moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors; and moderately limited in the ability to set realistic goals or make plans independently of others. (AR 611-24.) Dr. Rattan noted that Nieves was capable of performing basic work activities consistent with his abilities and interests. (AR 623.)

Nieves was examined at Stroger Hospital on July 20, 2011, for racing thoughts, paranoia, feeling sad, and auditory hallucinations, as a result of being out of his medications for the

previous three months, and he was given a global assessment of functioning (GAF) score of 50-60. (AR 643.) At that time he also denied having any past suicide attempts. (AR 641.) He returned on September 28, 2011 for medication refills. (AR 650.) He returned again for medication refills on January 4, 2012, at which point he stated that he still had racing thoughts but no auditory hallucinations and indicated that the medicine was helping; Nieves declined a psychiatric evaluation at this time. (AR 668-69.)

He returned again to Stroger Hospital on February 17, 2012, and was seen by a psychiatrist, Ellen Tylkin, M.D. (AR 674.) He complained of forgetting things, hearing voices, having difficulty concentrating, getting angry for no reason, and worrying that something bad is going to happen when he goes outside; he also indicated that he had three past suicide attempts. (*Id.*) His medications at the time were Risperdal, Zoloft, Buspar, Trazodone, and Levothyroxine. (*Id.*) He told Dr. Tylkin he had no children. (AR 676.) Dr. Tylkin diagnosed him with major depressive disorder with psychotic features and ruled out generalized anxiety disorder; she assessed a GAF score of 40-50 and added a prescription for Clonazepam at bedtime. (AR 679.)

*Administrative Hearing and Decision*

Nieves was present at the September 7, 2011 hearing and requested a postponement. (AR 112.). There were also postponements requested during the November 16, 2011 hearing and the January 6, 2012 hearing. (AR 101, 92.) A hearing was conducted before ALJ James D. Wascher in Chicago, Illinois on April 13, 2013. Three individuals testified at the hearing: Nieves; Dr. Larry Kravitz, a psychological expert; and James Breen, a vocational expert ("VE"). (AR 36.) The ALJ also considered documents relating to Nieves's medical history.

At the hearing, Nieves testified regarding his current problems relating to depression, including mood swings, forgetfulness, feeling frightened, and hearing things. (AR 45-46.) He

explained that some days, he felt okay and that some days, he felt sad.  (AR 45.)  He stated that he is taking four different medications and that most symptoms have gone away as a result of the medication, but he thinks he experiences side effects.  (AR 48.)  He said that he had been seeing Dr. Chen since as early as 2004.  (AR 58.)  He testified to being suicidal in 2005 and 2006 when the medications were not working.  (AR 48.)  He also explained that the doctors would adjust his dosage of Risperdal when he complained of hearing things and this problem faded when the dosage was increased.  (AR 50.)  Nieves testified that he used heroin for about a year before stopping in 2004 and never used cocaine.  (AR 52.)

Nieves stated that he carries out regular grooming activities, such as shaving, showering, and getting dressed for himself, but that cooking, cleaning, laundry and grocery shopping is completed by the person with whom he is living.  (AR 53-54.)  He takes out the garbage, lets the dogs out, cleans his room, makes the bed, washes up, makes coffee, and sometimes helps with grocery shopping but has to write the grocery list down to remember.  (AR 54.)  He said he spends most of his time watching TV, sitting in the yard, or going for a walk; but when he walks, his legs hurt due to the compound fracture on his left ankle.  (AR 55.)  He explained that he worked as a laborer but could not maintain this job because of his compound fracture, and he also went on numerous interviews but would explain his medical situation and would not be called back.  (AR 56-57.)

Dr. Kravitz, a psychologist, testified there was sufficient, but not ideal, evidence in the record to form an opinion concerning Nieves's mental status.  (AR 61.)  Dr. Kravitz pointed out that there were inconsistencies between the dates Nieves claimed to have stopped using alcohol and drugs and what was actually in the record.  (AR 66.)  Dr. Kravitz opined that Nieves did not meet or equal the Commissioner's Listing of Impairments 12.02 with the B criteria.  (AR 67.)

He pointed out that the notes from Dr. Chen, who Nieves claims to have seen for five years, are sparse.  (AR 68.)  He also emphasized that many of the dates in the record seem to be inconsistent with Nieves's testimony and that Nieves is not receiving intensive outpatient treatment on a frequent basis.  (AR 70.)  He noted that Nieves presented as preoccupied, distracted, and anxious but that his thought processes were logical and coherent.  (AR 69.)

Dr. Kravitz testified that based on the record, he believes Nieves to have:  mild to moderate impairment in ADLs; a moderate impairment in social functioning; a moderate impairment in concentration, pace persistence; with one to two decompensations.  (AR 70.) Without incorporating Nieves's presentation at the hearing, Dr. Kravitz would limit him to: understanding, remembering, and carrying out short, simple instructions; brief and superficial workplace contact; no more than ordinary levels of stress; working in an environment where the tasks are repetitive, consistent, predictable, and have little contact with coworkers; and supervision that is mostly task-instructive and focused.  (AR 71-72.)  Within those parameters, Dr. Kravitz opined that Nieves should be able to manage a work routine.  (AR 72.)  However, Dr. Kravitz opined that if he took into account Nieves's presentation at the hearing, he thought it unlikely Nieves would be able to complete even simple, repetitive tasks without his symptomology interfering.  (*Id.*)

Breen, the VE, testified that Nieves is in the younger individual age category with a high school education.  (AR 78-79.)  The ALJ asked Breen hypothetically if there are available jobs for someone with Nieves's limitations, including:  limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing, walking or sitting for 6 hours in an 8-hour shift; limited in ability to maintain concentration, persistence, or pace; limited to performing simple, routine, repetitive tasks with few changes in workplace setting; and brief, superficial interaction

with supervisors, general public and coworkers.  (AR 79-81.)  Breen responded affirmatively and stated that there are available jobs, such as electrical accessories assembler, mold machine tender, and hand packager.  (AR 79-80.)  When asked about the customary tolerance for being off-task, Breen responded that being off-task 20 percent of the day would be above the customary tolerances and that it is generally about 10 percent of the work day, but this is not defined in the Dictionary of Occupational Titles.  (AR 81-82.)  Breen also responded to a question from Nieves's attorney that an individual who is absent from work three to four times per month would be unemployable.  (AR 83.)

Following the hearing, on July 18, 2012, the ALJ issued a decision finding that Nieves was not disabled within the meaning of the Social Security Act (the "SSA"), from May 1, 1998 through the date of the decision.  (AR 11.)  In making his decision, the ALJ made findings according to the requisite five-step analysis, discussed in more detail below:  (1) Nieves had not engaged in substantial gainful activity since October 21, 2010; (2) he had a severe impairment in the form of Hepatitis C, status post right ankle fracture, major depressive disorder, polysubstance abuse, and hypothyroidism; (3) his impairment did not meet or equal the criteria of a Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R.416.920(d), 416.925 and 416.926), under the SSA; (4) he had residual functional capacity to perform light work with no postural limitations, no manipulative limitations, no communicative limitations, and no environmental limitations; and (5) Nieves was able to perform jobs that exist in significant numbers in the national economy.  (AR 11-28.)

## LEGAL STANDARD

Section 405(g) of the SSA grants federal courts the authority to review the Commissioner's final decision and enter a judgment, affirming, modifying, or reversing the

decision, with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g). The scope of judicial review is quite limited; a district court will affirm the ALJ's decision as long as it is supported by substantial evidence in the record and no error of law occurred. *Id.*; *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000) (citation omitted). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This is more than a scintilla but can be less than a preponderance. *Skinner*, 478 F.3d at 841. "The ALJ is not required to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and the conclusions." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) (citation omitted). In determining whether substantial evidence supports the ALJ's decision, the court will review the entire administrative record but will not reweigh evidence, reevaluate facts, make decisions of credibility, resolve conflicts in the evidence, or substitute its judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

## ANALYSIS

The determination of whether a claimant suffers from a disability as defined in the SSA is conducted through a five-step inquiry, evaluated in sequence: (1) whether the claimant is engaged in substantial gainful activity, *i.e.*, is employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner as conclusively disabling (*see* 20 C.F.R. § 404, Subpt. P, App.);

(4) whether the claimant can perform his past relevant work[2]; and (5) whether the claimant is capable of performing work in the national economy. 20 C.F.R. § 404.1520; *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). The claimant has the burden of proof for steps one through four; the Commissioner has the burden of proof for step five. *Clifford*, 227 F.3d at 868 (citation omitted).

*The ALJ's Step Three Finding that Nieves Did Not Have a Listed Impairment*

Nieves challenges the ALJ's finding at step three that his impairments do not meet or equal a listed impairment. He argues that the ALJ improperly analyzed the medical evidence in failing to properly assess the opinions of treating physician Dr. Tylkin, medical expert Dr. Kravitz, and the state agency consultants. At step three, an ALJ must evaluate whether a claimant is so severely impaired that he is disabled, regardless of his age, education and work experience. 20 C.F.R. § 404.1520(d). To satisfy this step, the claimant's condition must meet or equal one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.

With respect to joint injuries, based on Section 1.02, a claimant will be found to have major dysfunction if there is:

> gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).

20 C.F.R. § 404, Subpt. P, App. 1. In this case, the ALJ found no gross anatomical deformity and no inability to ambulate effectively. (AR 14.) The ALJ also considered the ankle injury under Section 1.06, 20 C.F.R. § 404, Subpt. P, Appendix 1, and found that these requirements

---

[2] The term "past relevant work" means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that the disability must be established.

were not satisfied as Nieves's fracture healed, the x-rays showed good alignment, his gait was normal, and he did not use assistive devices.  (AR 14.)

With respect to Nieves's hypothyroidism, thyroid disorders are evaluated under 4.00 for blood pressure and heart rate that cause arrhythmias or other cardiac dysfunction, under 5.00 for thyroid-related weight loss, under 11.00 for hypertensive cerebrovascular accidents (strokes), and under 12.00 for cognitive limitations, mood disorders, and anxiety.  20 C.F.R. § 404, Subpt. P, App.  The ALJ found that in this case none of these symptoms is present except for a mood disorder, which was assessed to be related to Nieves's polysubstance abuse.  (AR 14-15.)  Also, the ALJ found that Nieves's Hepatitis C does not satisfy the severity requirements of 5.05, and that while he was diagnosed, he has not been treated.  (AR 15.)

With respect to mental disorders, a claimant will be found to be disabled if he has at least two of the following functional limitations, described as "paragraph B" criteria:  "marked" restrictions on activities of daily living; "marked" difficulties in maintaining social functioning; "marked" difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  In this case, the ALJ, applying the "paragraph B" criteria, found that Nieves's mental impairments, considered singly or in combination, did not meet or equal the listing 12.04.  (AR 15.)  First, the ALJ found that Nieves had mild restriction in his activities of daily living.  The ALJ relied on Nieves's testimony that he is able to shower, groom, and dress himself independently; the ALJ also relied on a function report in which Nieves indicated that he did not have any problems performing personal care, although he needed reminders to do so.  (*Id.*)  The ALJ next found that Nieves had moderate difficulties in social functioning, noting, among other things, that Nieves lived in a two-person cell while incarcerated without apparent difficulty and stated that he had good relationships with his mother

and siblings and had a friend (or girlfriend) of six years duration. (AR 16.) The ALJ then found that Nieves has moderate difficulties with respect to concentration, persistence or pace, noting that while Nieves stated he had trouble with memory and concentration, he also said he had no problem completing tasks, understanding or following; prison records showed that his cognition was fully or grossly intact; and a July 2011 examination revealed his short-term and long-term memory were intact. (*Id.*) Lastly, the ALJ found that Nieves had no episodes of decompensation of extended duration. (*Id.*) The ALJ also noted that his finding was based on Dr. Kravitz's testimony and state agency psychologist consultant Kyla King's opinion. (*Id.*)

Nieves argues that the ALJ erred in his assessment of the opinions offered by Nieves's treating physician, Dr. Tylkin, that Plaintiff's "depression was not adequately treated" by his medical regimen, and that his functioning was consistent with "major impairment" in "several areas, such as work . . . family relations, judgment, thinking, or mood", and at best indicated "serious impairment in social, occupational . . . functioning (e.g., no friends, unable to keep a job)." (Pl. Br. at 9.) However, Nieves misuses the quoted text in relation to "major impairment" and "serious impairment" because these words were taken from GAF 40 and GAF 50 score descriptions (as described in a footnote in the brief) that include other possibilities, such as "some impairment" or "serious symptoms," both of which the ALJ reported in the opinion. (AR 25.)

Additionally, with regard to Dr. Tylkin's assessment that the "depression was not adequately treated," Nieves cites *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011), among other cases, to show that the ALJ must offer "good reasons" for discounting the opinion of a treating physician according to 20 C.F.R. § 404.1527(c)(2). (Pl. Br. at 9.) However, unlike in *Scott*, 647 F.3d at 739, where the ALJ did not provide evidence from the record or sufficient

reasons for relying on the conclusions of other doctors, the ALJ in this case provided numerous examples in the record of Nieves being "relatively stable" and his symptoms being well-controlled by medication.  (AR 21-23.)  Additionally, Dr. Tylkin only examined Nieves one time based on the evidence included in the record, and, according to 20 C.F.R. § 404.1527(c)(2), a treating source is "able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of *individual examinations*."  20 C.F.R. § 404.1527(c)(2) (emphasis added).  In this case, Dr. Tylkin's examination is not consistent with that of a "treating source."

Nieves also argues that the ALJ erred in his assessment of Dr. Kravitz's opinions in that he relied on the portion of Dr. Kravitz's opinion that did not incorporate Nieves's presentation at hearing.  However, the ALJ determined Nieves's statements concerning the intensity, persistence and limiting effects of the symptoms to be not credible.  (AR 25-26.)  Additionally, Dr. Kravitz, as an impartial medical expert, explained that *if* he took into account Nieves's presentation at the hearing, he would say it is unlikely Nieves would be able to persist on even simple, repetitive tasks.  (AR 72.)  However, earlier in the testimony, Dr. Kravitz also pointed out the inconsistencies between the record and Nieves's testimony.  Given the credibility determination made by the ALJ, the ALJ was not required to rely on Dr. Kravitz's opinion that included Nieves's subjective testimony.  An ALJ is in a "unique position" to observe a witness, and for this reason, an ALJ's credibility determinations are not normally disturbed.  *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997).

Substantial evidence supports the ALJ's finding that Nieves's impairment does not meet or equal a listing.  As discussed above, the ALJ supported his finding with an explanation of the

evidence he relied upon, thus building a "logical bridge" between his conclusions and the evidence. *Jones*, 623 F.3d at 1160. That finding is consistent with an evaluation by Dr. Korshidi, a state agency medical consultant, who opined that Nieves could perform light work. (AR 547.) Likewise, Dr. King, PsyD, submitted a state agency report and opined that Nieves had the ability to perform at least unskilled work. (AR 553.) An ALJ "may properly rely upon the opinion of [state agency] medical experts." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). Nieves also argued that the opinion of Dr. Rattan, a state agency medical consultant, should not have been given greater weight than that of Dr. Kravitz, who was able to review the full record and observe the claimant. However, for the same reason, the ALJ was able to properly rely on the opinion of Dr. Rattan, a state agency medical consultant. The ALJ's finding at step three is affirmed.

### *The ALJ's Finding of Nieves's Residual Functional Capacity*

Before moving from step three to step four, an ALJ must assess a disability claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. 404.1520(a)(4). The ALJ then uses that assessment at both steps four and five. *Id.* In this case, the ALJ found that Nieves had the RFC to perform light work, as defined in 20 C.F.R. 416.967(b), and could lift up to 20 pounds occasionally, lift or carry up to 10 pounds frequently, could stand and/or walk approximately 6 hours per 8-hour workday and sit for approximately 2 hours per 8-hour workday with normal breaks and has no limitations in the ability to push/pull. The ALJ further found that Nieves was moderately limited in the ability to maintain concentration, persistence, or pace, and that as such, "work is limited to simple, routine and repetitive tasks, with brief, superficial interaction with coworkers and supervisors, and no interaction with the general public." (AR 16.) The ALJ stated that this finding was based on careful consideration of the entire record. (*Id.*)

Nieves argues that the ALJ improperly assessed his credibility, mischaracterized the evidence and improperly omitted consideration of the side effects of the medication. First, Nieves claims the ALJ did not believe Nieves on the basis that his symptoms were inconsistent with the RFC findings. Nieves misapplies the ALJ's findings. The ALJ wrote, "the claimant's statement concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC]." (AR 25-26.) The ALJ did not say these statements were not credible *because* they were inconsistent with the RFC, only *to the extent* they are inconsistent with the RFC, meaning the ALJ finds the statements credible to a certain point, and this is the point at which the RFC was determined.

Nieves also argues that the ALJ failed to properly consider Dr. Rattan's opinion when determining credibility in that Dr. Rattan described Nieves as "credible." (AR 627.) Nieves cites *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010), to assert that an ALJ may not ignore contrary lines of evidence. However, the immediately preceding sentence written by Dr. Rattan in this examination states Nieves "is able to perform basic work activities consistent with his abilities and interests." (AR 627.) Therefore, this is consistent with the ALJ's determination that Nieves's symptom reporting is credible to the extent that it is consistent with the RFC, as explained above, and is not a contrary line of evidence. (AR 25-26.) Additionally, an ALJ considers medical opinions together with the rest of the relevant evidence in the record and is not required to adopt a doctor's medical conclusion verbatim. *See* 20 C.F.R. § 404.1527(b)-(c).

Nieves asserts that the ALJ improperly substituted his own lay opinion for that of treating psychiatrist Dr. Tylkin by writing "the prescribed medication and treatment have been effective and have improved his conditions." However, as discussed above, the ALJ provided numerous examples in the record of Nieves being "relatively stable" and his symptoms being well-

controlled by medication.  (AR 21-23.)  It "is only when the ALJ's determination lacks any

explanation or support that it will [be declared] patently wrong."  *Elder v. Astrue*, 529 F.3d 408,

413-14 (7th Cir. 2008) (internal citations and quotations omitted); *see also Armstrong v.

Barnhart*, 287 F. Supp. 2d 881, 885-86 (N.D. Ill. 2003) ("the accusation [of 'playing doctor']

may be tossed about a bit too casually.  The Seventh Circuit has noted that "cases in which [they]

have reversed because an ALJ impermissibly 'played doctor' are ones in which the ALJ failed to

address relevant evidence.") (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)).

Nieves claims the ALJ mischaracterizes the evidence when he writes that there were "no

psychiatric hospitalizations," that Nieves had "very little treatment" since his 2011 discharge,

and that "there is no medical opinion stating the claimant is unable to work."  (AR 26.)  With

respect to psychiatric hospitalizations, Nieves has misconstrued the ALJ's finding.  The ALJ

wrote "no hospitalizations" in reference to Nieves's treatment since his February 2011 release

from prison, and there is nothing in the record showing a psychiatric hospitalization since his

February 2011 release.  (*Id.*)  The ALJ did recognize that Nieves was psychiatrically hospitalized

in 2009, earlier in the decision.  (AR 20.)

With regard to the ALJ's determination that Nieves received "very little treatment" since

his February 2011 release, Nieves cites *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) that

"although the ALJ drew a negative inference as to Craft's credibility from his lack of medical

care, she . . . did . . . [not] note that a number of medical records reflected that Craft had reported

an inability to pay for regular treatment and medicine."  However, in this case, the ALJ did note

past records, indicating how Nieves pays for medication ($20 per month from his mother) and

when he was out of his medication.  In support of this assertion, the ALJ also points out that

Nieves declined a psychiatric evaluation at one of his most recent appointments on

January 4, 2012. (AR 668-69.) Although the ALJ characterized Nieves's four or five hospital visits in a one-year period as "little treatment," this does not constitute reversible error. As noted above, it "is only when the ALJ's determination lacks any explanation or support that it will [be declared] patently wrong," *Elder*, 529 F.3d at 413-14 (internal citations and quotations omitted), and, in this case, the ALJ provided an explanation of his decision.

Finally, Nieves takes issue with ALJ's determination that "there is no medical opinion stating the claimant is unable to work." As discussed more fully above, Dr. Kravitz did not provide an opinion stating that Nieves is unable to work. He first testified that within the parameters given, Nieves "should be able to manage a work routine." (AR 72.) Dr. Kravitz then posits that *if* he were to take the presentation at the hearing into account, "then I would say, in my opinion, it's unlikely that he would be able to persist on even simple, repetitive tasks without his symptomology breaking through and interfering with his focus. . . ." (*Id.*) As mentioned above, given the credibility determination made by the ALJ, the ALJ was not required to rely on the portion of Dr. Kravitz's opinion that included Nieves's subjective testimony.

Nieves also argues that the ALJ does not clearly articulate the inconsistencies that cause him to find that Nieves "may not be entirely reliable" (AR 26.), and he cites *Scott v. Barnhart*, 297 F.3d 589 (7th Cir. 2002) to maintain "ALJs must sufficiently articulate their assessment of the evidence . . . to enable us to trace the path of their reasoning." However, in the same paragraph, the ALJ lists the inconsistencies to which he is referring, including: "denied drug and alcohol abuse but elsewhere admitted to such abuse/usage"; "had children with other women, but elsewhere he said he had no children"; and "was an only child, but elsewhere he said he [was] one of four children." (AR 26.) This clearly articulates the ALJ's assessment and traces the path of his reasoning. An ALJ is not required to believe all of an applicant's testimony and is "free to

18

discount the applicant's testimony on the basis of other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

Finally, Nieves claims the ALJ erred in not considering the side effects of Nieves's medication in determining credibility. However, of the eighteen portions of the record cited in support of this, only four of these sections contain a medical opinion referencing side effects of Nieves's medicine, and most of them list no side effects experienced. (AR 289, 345, 398, 401, 479, 623.) In his brief, Nieves points to possible side effects that his medication could include but, for most of these, does not point to evidence in the record of a medical opinion stating that Nieves had experienced these side effects due to medication. Additionally, contrary to Nieves's assertion, the ALJ addresses the issue of side effects numerous times in his opinion. (*See* AR 22 ("He continued on Risperdal, although he still had some racing thoughts."); *see also id.* (Nieves said, "his medications (Risperdal, Sertraline and Trazodone) were working well and that he continued to be without any side effects," referencing one of the citations in the record at AR 578 that Nieves's attorney relied on to show side effects); *see also* AR 22 ("He said the 'thought racing' he once had was no longer an issue after his Risperdal dosage was decreased."); *see also* AR 23 ("He stated that, while on Risperdal, his thought racing continued to be under good control."); *see also id* ("He stated that his medications . . . had worked well for him with no side effects.")). Therefore, this argument is unfounded.

In this case, the ALJ properly and carefully explained why he found Nieves's symptom reporting and medical history to be not entirely credible or reliable when viewed in light of other evidence, including contradictions in his own testimony. (AR 26.) As such, the ALJ did not commit an error in discounting some of Nieves's allegations about the severity of his impairment in assessing his RFC.

Finally, Nieves argues the Commissioner did not meet his burden of proving that Nieves can perform jobs that exist in adequate numbers in the national economy. Nieves argues that the ALJ did not adequately include all of Nieves's limitations when he asked the VE the hypothetical question whether jobs existed that matched Nieves's RFC. (AR 79.) Specifically, Nieves contends that the ALJ failed to include any specific limitations on concentration, persistence or pace.

As noted above, the ALJ's RFC finding reasonably accounted for and was consistent with the evidence in the record and the testimony at the hearing. Likewise, the ALJ's hypothetical question to the VE was consistent with his RFC finding. (*Compare* AR 16 *with* AR 79-81.) Specifically, the ALJ asked the VE to assume that "the individual would be moderately limited in the ability to maintain concentration, persistence, or pace," and asked if there were jobs that "would be limited to performing simple, routine, repetitive tasks with few, if any, changes in workplace setting." (AR 80.) Nieves initially cites to *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009), to assert an ALJ cannot account for a plaintiff's moderate deficiencies in concentration, persistence or pace by restricting him to simple routine tasks that did not require constant interactions with coworkers or the general public. However, in *Stewart,* the hypothetical did not mention Stewart's moderate difficulties in maintaining concentration, persistence, and pace at all. *Stewart*, 561 F.3d at 682. By contrast, the ALJ in this case explicitly stated a moderately limited ability to maintain concentration, persistence, or pace in the hypothetical. Therefore, the ALJ's hypothetical was not inadequate.

In the other case cited by Nieves, *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010), the Seventh Circuit explained that the ALJ is required to generally "orient the VE to

the totality of a claimant's limitations," including deficiencies of concentration, persistence and pace. However, the court specifically noted that there is no "per se requirement" that the ALJ mention the specific terminology of "concentration, persistence and pace," and that hypotheticals omitting those terms are acceptable where it is "manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *Id.* In *O'Connor-Spinner*, the Seventh Circuit remanded the ALJ's decision because the ALJ failed to expressly refer and account for "all limitations" that the ALJ had found to exist. *O'Connor-Spinner*, 627 F.3d at 618, 621. As noted above, this deficiency is not present in the hypothetical given by the ALJ in the case of Nieves. The ALJ's RFC finding here both included the referenced terminology of "concentration, persistence and pace" and was also supported by substantial evidence. Additionally, in contrast to *O'Connor-Spinner*, the ALJ expressly accounted for all limitations included in Nieves's RFC when he posed the hypothetical to the VE. Therefore, the ALJ's hypothetical was not inadequate to capture Nieves's RFC. The decision to deny Nieves disability benefits is affirmed.

## CONCLUSION

For the foregoing reasons, Nieves's Motion for Summary Judgment is denied, and Commissioner's final decision is affirmed. The civil case is terminated.


Date: _____February 13, 2014_____          _____
                                                JOHN W. DARRAH
                                                United States District Court Judge